Michael A. Caddell
Cynthia B. Chapman
Gregory K. Evans
**CADDELL & CHAPMAN**
1331 Lamar, Suite 1070
Houston TX 77010
Telephone 713.751.0400
Facsimile: 713.751.0906
mac@caddellchapman.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| **VINCENT LAROCCA, et al.** | ) | |
| | ) | |
| | ) | **CASE NO.: 15-cv-2511** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **PLAYGROUND DESTINATION** | ) | |
| **PROPERTIES, INC.,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | **PLAINTIFFS' ORIGINAL** |
| | ) | **COMPLAINT** |

# I.
## INTRODUCTION

Plaintiffs, Vincent LaRocca, Donna LaRocca, Imtiaz Allie, Warren Ackerman, Mary Bannon, Denis Barrett, Susan Barrett, Brian Barry, Joel Brody, Maurice Byrne, Chris Costello, Kathleen Costello, Don Darroch, Siobhan Dempsey, George Dreyer, Marilyn A. Dreyer, Kathleen Goodman, Kenneth Goodman, Bobby C. Green, Georgina Hamilton (Felton), Meegan Hinds, Janet Humphries, Michael Humphries, William Kelly, Nigel Kennett, Garrett Kenny, Vanessa Kim, Kristine Kramer, Richard Kramer, Charles Larsen, Marc Letourneau, Stewart Lonky, Jeff Matheny, Alan Mishlove, Pradeep Mehta, Anastasios Pantelidis, Paryus Patel, Paul Perkins, Dale Petrovitch, Doreen Petrovitch, Cal Pye, Tom Ray, Laurie Rice, Stuart Rice, Michelle Rogers, Robert Seguin, John Stockton, Russell Thompson, Dennis Weihs, Kim Weihs, Hugh Westwater, Richard Wilde, and Peter Williams  (collectively "Plaintiffs") through their attorneys, file this, their Original Complaint, asserting claims against Defendant PLAYGROUND DESTINATION PROPERTIES, INC. ("Playground"), and in support, allege as follows:

The Plaintiffs include retirees, a sitting judge, doctors, accountants, and business owners. Beginning in 2003, Plaintiffs purchased property units in a construction project on the Turks & Caicos islands based on representations made by Playground.  Plaintiffs were required to provide a 20% (twenty percent) deposit.  Playground assured Plaintiffs that this deposit would be placed into a safe, interest-bearing trust account, and even claimed that it would be "protected" from "all circumstances" even including "unforeseen circumstances."   Between 2004 and 2007, Playground also assured Plaintiffs that the underlying construction project was on track.  It was not until 2008 that Plaintiffs were informed that their deposit would not be refunded.  Plaintiffs now bring this action to recover these deposits (in addition to other relief), and allege violations of the consumer protection acts of Connecticut, New York, California, Colorado, Florida, Illinois, Massachusetts, Ohio, Pennsylvania, Virginia, and West Virginia, as well as negligent misrepresentation and unjust enrichment.

## A.      PLAINTIFFS

1.      Plaintiff Vincent LaRocca is a citizen and resident of the State of New York, residing in Scarsdale, New York.

2.      Plaintiff Donna LaRocca is a citizen and resident of the State of New York, residing in Scarsdale, New York.

3.      Plaintiff Imtiaz Allie is a citizen and resident of the State of Connecticut, residing in Bethel, Connecticut.

4.      Plaintiff Warren Ackerman is a citizen and resident of London.

5.      Plaintiff Mary Bannon is a citizen and resident of the State of Massachusetts.

6.      Plaintiffs Denis and Susan Barrett are citizens and residents of England residing in Surrey.

7.      Plaintiff Brian Barry is a citizen and resident of Canada residing in Ontario.

8.      Plaintiff Joel Brody and Alan Mishlove are citizens and residents of the State of Illinois residing in Lake County.

9.      Plaintiffs Maurice Byrne and Siobhan Dempsey are citizens and residents of Canada residing in Grey County, Ontario.

10.     Plaintiffs Chris and Kathleen Costello are citizens and residents of the State of Virginia residing in Henrico County.

11.     Plaintiff Don I. Darroch is a citizen and resident of Canada residing in Ontario.

12.     Plaintiffs George and Marilyn A. Dreyer are citizens and residents of the State of Massachusetts.

13.     Plaintiffs Kenneth and Kathleen Goodman are citizens and residents of the State of New York residing in Nassau County, and Plaintiffs Dennis S. and Kim A. Weihs are citizens and residents of the State of New York residing in Nassau County.

14.     Plaintiff Bobby C. Green is a citizen and resident of the State of Florida residing in Miami Dade County.

15.     Plaintiff Georgina Hamilton (Felton) is a citizen and resident of England.

16.     Plaintiffs Michael and Janet Humphries are citizens and residents of England residing in Surrey.

17.     Plaintiff William Kelly is a citizen and resident of the State of Connecticut residing in Fairfield County.

18.     Plaintiff Nigel P. Kennett is a citizen and resident of England residing in London.

19.     Plaintiff Garrett Kenny is a citizen and resident of the State of Florida residing in Orange County.

20.     Plaintiff Vanessa S. Kim is a citizen and resident of Canada residing in Ontario.

21.     Plaintiffs Richard and Kristine Kramer are citizens and residents of the State of Illinois residing in Dupage County.

22.     Plaintiff Charles E. Larsen is a citizen and resident of Canada residing in Ontario.

23.     Plaintiffs Marc Letourneau and Meegan Hinds are citizens and residents of Canada residing in Ontario.

24.     Plaintiffs Stewart Lonky, M.D. and Paryus Patel, M.D. are citizens and residents of the State of California residing in Los Angeles County.

25.     Plaintiff Jeff Matheny is a citizen and resident of the State of West Virginia residing in Wood County.

26.     Pradeep Mehta is a citizen and resident of the United Kingdom.

27.     Plaintiff Anastasios Pantelidis is a citizen and resident of the State of Ohio residing in Washington County.

28.     Plaintiff Paul Perkins is a citizen and resident of Canada residing in Ontario.

29.     Plaintiffs Dale and Doreen Petrovitch are citizens and residents of the State of Pennsylvania residing in Delaware County.

30.     Plaintiffs Cal Pye and Michelle Rogers are citizens and residents of Canada residing in North Vancouver.

31.     Plaintiff Tom Ray is a citizen and resident of England residing in Surrey.

32.     Plaintiffs Stuart and Laurie Rice are citizens and residents of the State of California residing in Los Angeles County.

33.     Plaintiff Robert Seguin is a citizen and resident of Canada residing in Ontario.

34.     Plaintiff John Stockton is a citizen and resident of Canada residing in Ontario.

35.    Plaintiff Russell Thompson is a citizen of the United Kingdom and a resident of Canada.

36.    Plaintiff Hugh N. Westwater is a citizen and resident of the State of Ohio residing in Franklin County.

37.    Plaintiff Richard Wilde is a citizen and resident of England residing in Surrey.

38.    Plaintiff Peter Williams is a citizen and resident of England.

B.    **DEFENDANT**

39.    At all times relevant to this lawsuit, Defendant Playground Destination Properties, Inc. ("Playground") has been a Washington-state corporation headquartered in Denver, Colorado.

## II.
## JURISDICTION AND VENUE

40.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332(a) and 28 U.S.C. § 1367 because, *inter alia*, Defendant, Playground, resides in and is headquartered in Denver, Colorado, and the amount in controversy exceeds $75,000.

41.    This Court has personal jurisdiction over Defendant, Playground, because it regularly and systematically conducted business in Colorado, and because it resides in and is headquartered in Colorado.

42.    Venue is proper within this District pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to these claims occurred in this District and because Defendant Playground resides in and is headquartered in this District.

### III.
### FACTUAL BACKGROUND

**A.      PRELIMINARY STATEMENT**

***Underlying Facts – Plaintiffs lost deposits they made to purchase Veranda Units***

43.     Plaintiffs are pursuing claims against Playground for violations of consumer protection acts, negligent misrepresentation, and unjust enrichment.  Playground and its affiliate, Intrawest U.S. Holdings, Inc. ("Intrawest"), own and operate numerous alpine skiing resorts located in North America, most of which are located in the United States.

44.     Playground and Intrawest market these properties to individuals interested in investing in luxury vacation housing.  Playground and Intrawest solicit people living in the United States, Canada, England, and all over the world to purchase luxury condominiums in its resorts.

45.     The instant case is based on a resort that Playground and Intrawest (along with other companies) developed in Turks & Caicos, a small island nation located in the Bahamas.  The Turks & Caicos islands are a British territory that has become a popular beach tourist destination.

46.     In 2003, Playground and Intrawest assisted in the development of a luxury resort on Turks & Caicos called Veranda.  Playground represented in its promotional materials that Veranda had the prime location on the island in the spectacular "Grace Bay" region: "[t]his twelve-mile stretch of talcum powder sand and turquoise water is one of the most spectacular sights you will ever see."  Playground Brochure at 1, attached hereto as Exhibit A.[1]

47.     Veranda was to be comprised of approximately 100 luxury condominium units

_____

[1] Exhibit A identifies Playground Destination Properties as an "Intrawest Company."

7

and a common area housing a restaurant, a bar, a pool, and many other amenities.  The prices of individual units within Veranda ranged from $300,000 to over $3 million.

48.     Playground's primary role was to market and sell the units to individuals (another company discussed later herein was responsible for construction).  Playground did so by directly contacting its existing clientele by telephone and e-mail, *i.e.*, individuals who had purchased units from Playground and/or Intrawest in their other resorts.

49.     Thus, during 2003 and 2004, Playground marketed Veranda by soliciting its existing clientele and others.  Playground persuaded each of the Plaintiffs to purchase a unit in Veranda (a few Plaintiffs own multiple units).

50.     Each Plaintiff signed a contract for the purchase of a Veranda unit(s), and at that time was required to pay a deposit equal to twenty percent (20%) of the purchase price.  The deposits ranged from $60,000 to $1.1 million.  In aggregate, Plaintiffs made deposits totaling approximately $6.5 million.

51.     Prior to (and after) making the deposit, Playground uniformly represented to Plaintiffs that the deposit would be safe from "all circumstances" including "unforeseen circumstances."

52.     Specifically, Playground made the following representation in the brochure it provided Plaintiffs: "Veranda will only require a 20% down payment and these funds will be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."   Playground Brochure at 2, Ex. A. Further, Playground representatives repeatedly assured Plaintiffs over the telephone and by e-mail that their deposits would be safe in all circumstances.

53.     However, the Plaintiffs' deposits were not "protected" as Playground represented.

8

The company in charge of construction, Cherokee LTD ("Cherokee"), exhausted the deposits.

54.     The construction company ultimately filed for bankruptcy protection in the United Kingdom.  The Plaintiffs recovered nothing from the bankruptcy.

55.     The Plaintiffs lost approximately $6.5 million worth of deposits.

56.     They seek to recover their deposits from Playground, who assured them that their deposits would be safe in all circumstances.

57.     These assurances from Playground were negligent misrepresentations that caused the Plaintiffs damages in the form of $6.5 million in lost deposits, as well as other related sunk costs totaling approximately $70,000 and lost interest totaling over $1.5 million.

58.     Playground profited from its marketing of Veranda, as it was compensated for each purchase contract that it persuaded a Plaintiff to execute.  In other words, Playground was compensated for each sale it made, receiving millions of dollars in commissions based on the successful marketing efforts it directed at the Plaintiffs.

59.     Alternatively, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs on condominiums that they never received.

60.     The Plaintiffs seek to recover the deposits, foregone interest, and other out-of-pocket costs they lost due to Playground's misrepresentations regarding the safety of their deposits and due to its unjust enrichment in the form of millions in commissions from money that Plaintiffs deposited for condominiums they never received.

***This Litigation Began in New Jersey in 2010.***

61.     This litigation began as a class action in August 2010 in federal district court in New Jersey (the "New Jersey Litigation"), styled as *Donachy, et al. vs. Intrawest ULC, et al.*, in

the United States District Court for the District of New Jersey, Civ. Act. No. 1:10-cv-4038 (RMB) (KMW).

62.    Playground filed numerous dispositive motions in an effort to get the New Jersey federal court to dismiss the entire case, including a *forum non conveniens* motion to persuade the New Jersey district court that the case should proceed in the Turks & Caicos island, which the court rejected.

63.    The New Jersey district court also denied Playground's other dispositive and non-dispositive motions.

64.    During 2012, the New Jersey district court advised the parties that the case was likely not suitable for class action treatment and that it wanted to focus on the home-state claims – the claims of the four New Jersey couples.

***Non-New Jersey Plaintiffs and Playground entered into Tolling Agreement.***

65.    Accordingly, the parties worked together to voluntarily dismiss all of the non-New Jersey claims – *i.e.*, the claims that Plaintiffs are pursuing herein – as part of a tolling agreement.

66.    The tolling agreement is attached hereto as Exhibit B.

67.    The parties explained at the beginning of their tolling agreement that the purpose was to "save legal costs and avoid litigation in multiple *fora*." Ex. B, at §1.

68.    The purpose was also for the New Jersey Litigation to serve as a bellwether for the claims of the non-New Jersey plaintiffs (Plaintiffs herein).

69.    Hence, the tolling agreement contemplated a mediation to resolve the claims of the Plaintiffs herein soon after the resolution of the New Jersey Litigation. Ex. B at §5.

70.    If mediation failed, then the parties agreed that Plaintiffs would file suit in this

district because it is home to Playground's headquarters.  Ex. B at §6.

71.   The New Jersey district court approved of this approach, and beginning in January 2013, the New Jersey Litigation focused solely on the claims of the four couples who reside in New Jersey.

***Playground ultimately disclosed that it had insurance through AIG.***

72.   At a court-ordered settlement conference with the New Jersey Magistrate Judge in late 2014, for the first time Playground disclosed that it had insurance for these claims through its insurer, AIG.

73.   In its initial disclosures, Playground had previously stated that no insurance coverage was available.

74.   Thus, Plaintiffs were surprised to learn that Playground had approximately $6 million in insurance coverage for this dispute through AIG.

75.   This information was critically important, particularly given that the collective lost deposits of $6.75 million for all Plaintiffs (including the New Jersey plaintiffs) was just slightly more than the available insurance money of $6.0 million.

76.   As of now, approximately $5.5 million in insurance money is still available to resolve the instant claims (Plaintiffs' lost deposits total $6.5 million).

***Playground settled the New Jersey Litigation on eve of trial.***

77.   During the week leading up to trial, Playground and AIG agreed to settle the claims of the four New Jersey couples.

78.   Through this settlement, the four New Jersey couples each received back from Playground (AIG) 160% of their lost deposits.

79.   Once attorneys' fees and expenses were removed, the settlement permitted each

of them to recover over 90% of their lost deposits.

***Parties Mediated in Denver in early November, but could not resolve the instant litigation.***

80.     As contemplated by the tolling agreement, months after the New Jersey Litigation was resolved, the parties attempted to resolve the instant litigation through mediation in Denver with mediator Sandy Brook of the Judicial Arbiter Group.

81.     The parties, along with insurer AIG, mediated for two days in Denver, but were unable to resolve the instant litigation.

82.     Hence, Plaintiffs were forced to file the instant suit.

***Parties Agreed in Tolling Agreement that This Litigation Will Be Streamlined.***

83.     In their tolling agreement, the parties agreed that the instant litigation should not be burdened with the volume of dispositive motions and discovery stays that prolonged the New Jersey Litigation.

84.     Specifically, Playground expressly agreed not to file a dismissal motion based on lack of personal jurisdiction, improper venue, or *forum non conveniens*.  *See* Ex. B at §6.

85.     Further, Playground also expressly agreed not to seek to stay discovery if it filed a different type of dismissal motion.  *See id*. at §7.

86.     The parties also agreed that discovery in the New Jersey Litigation would not be duplicated in the instant litigation.  *See id*. at §7.

87.     In sum, the parties agreed to work together with this Court to reach a resolution as efficiently and as inexpensively as possible.

88.     Importantly, Playground filed every dismissal motion imaginable in the New Jersey Litigation.  Thus, the parties have already litigated the primary disputed issues in this case, and the New Jersey district court ultimately held that the New Jersey plaintiffs were

entitled to proceed to trial on their consumer fraud claims.

89.     Hereafter, the individual Plaintiffs herein are listed, along with their respective allegations of the misrepresentations that Playground made to each of them.

## B.     PLAINTIFFS VINCENT AND DONNA LAROCCA

90.     Plaintiffs Vincent and Donna LaRocca reside in Scarsdale, New York.   Mr. LaRocca is a technical manager at Innovation Technical Services in Connecticut.

91.     During the first half of 2004, a Playground representative solicited the LaRoccas to purchase a Veranda unit.

92.     Playground marketed Veranda as a real estate investment, more so than a vacation home.   Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

93.     Based on the investment aspect of this transaction, the LaRoccas were interested in investing in a unit in Veranda.

94.     The LaRoccas jointly purchased two units in Veranda by joining together with Imtiaz Allie and two New Jersey couples, the Kucharskis and the Wingfields.   (As noted above, Playground paid the Kucharskis and Wingfields their deposits back earlier this year through a settlement entered into just prior to trial in the New Jersey Litigation.)

95.     Mr. Kucharski – the spokesperson for this group of purchasers – spoke with a Playground representative (Taz Brown) on behalf of the LaRoccas (and the other members of this group) on many occasions before signing the purchase contract and making the deposit.   The Playground representative repeatedly assured Mr. Kucharski, and, in turn, the LaRoccas, that

their deposit would be safe in all circumstances.

96.     In July 2003, Mr. LaRocca and Mr. Kucharski traveled to Turks & Caicos to conduct research on Veranda and several other Turks & Caicos resorts.

97.     Prior to the trip (between May and July 2003), Mr. Kucharski corresponded with a Playground representative (Taz Brown) who advised Mr. Kucharski of the terms regarding the deposit and described the transaction as very secure and safe under all circumstances.

98.     During the July 2003 trip, Mr. Kucharski and Mr. LaRocca visited four to five different resorts, including Veranda.

99.     To learn about Veranda, on the first day of their trip they met with Karen Biker (a local real estate agent representing Veranda) who gave them a packet of materials.

100.    Included in those materials was the two-page brochure attached hereto as Exhibit A, which Mr. Kucharski and Mr. LaRocca both read.

101.    In the brochure, Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  They read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

102.    They both agreed that the deposit terms – only twenty percent (20%) down and the fact that it would be protected in all circumstances, including unforeseen circumstances – made Veranda a more attractive option than the other resorts.

103.    The deposit terms ultimately turned out to be the deciding factor in the decision by Mr. Kucharski and Mr. LaRocca to select Veranda over several other resorts.

104.    The security of the deposit was an important factor in the LaRoccas' decision to

purchase a Veranda unit.  They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  They would not have purchased a Veranda unit had they known that their deposit would be lost if Cherokee went bankrupt.

105.    After Playground's assurance that their deposit would be safe, the LaRoccas agreed to join the Kucharskis, Wingfields, and Mr. Allie in purchasing two units in Veranda. Mr. Kucharski signed the purchase contract in July 2004 on behalf of the group for two units and the group (the three couples and Mr. Allie) jointly made the $204,360 deposit.

106.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Kucharski, and, in turn, the LaRoccas (and the other members in their purchase group), between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

107.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and his deposit was not at risk, the LaRoccas (along with the other members in their purchase group) learned in 2008 that their deposit was lost.

108.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted the deposit paid jointly by the Kucharskis, Wingfields, LaRoccas, and Mr. Allie, and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

109.    In 2008, the LaRoccas (and the other members in their purchase group) learned that they would not recover any of the group's $204,360 deposit – of which $51,090 was paid by the LaRoccas.

110.    As explained above, Playground's negligent misrepresentations to the LaRoccas –

and the other members of their purchase group – caused them damages.

111.   Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

**C.     PLAINTIFF IMTIAZ ALLIE**

112.   Plaintiff Imtiaz Allie resides in Bethel, Connecticut.   Mr. Allie is a technical manager at Innovation Technical Services in Connecticut.

113.   During the first half of 2004, a Playground representative solicited Mr. Allie to purchase a Veranda unit.

114.   Playground marketed Veranda as a real estate investment, more so than a vacation home.   Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

115.   Based on the investment aspect of this transaction, Mr. Allie was interested in investing in a unit in Veranda.

116.   Mr. Allie jointly purchased two units in Veranda by joining together with the LaRoccas and two New Jersey couples, the Kucharskis and the Wingfields.   (As noted above, Playground paid the Kucharskis and Wingfields their deposits back earlier this year through a settlement entered into just prior to trial in the New Jersey Litigation.)   Mr. Allie joined together with the Kucharskis, Wingfields, and LaRoccas to jointly purchase two units in Veranda.

117.   Mr. Kucharski – the spokesperson for this group of purchasers – spoke with a Playground representative on behalf of Mr. Allie (and the other members of this group) on many

occasions before signing the purchase contract and making the deposit. The Playground representative repeatedly assured Mr. Kucharski, and, in turn, Mr. Allie, that his deposit would be safe in all circumstances.

118.    On Mr. Kucharski's and Mr. LaRocca's trip to Turks & Caicos in July 2003, they were provided with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  Mr. Kucharski and Mr. LaRocca, in turn, provided the brochure to Mr. Allie, who read it and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

119.    The security of the deposit was an important factor in Mr. Allie's decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

120.    After Playground's assurance that his deposit would be safe, Mr. Allie agreed to join the Kucharskis, Wingfields, and LaRoccas in purchasing two units in Veranda.  Mr. Kucharski signed the purchase contract in July 2004 on behalf of the group for two units and the group (the three couples and Mr. Allie) jointly made the $204,360 deposit.

121.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Kucharski, and, in turn, Mr. Allie (and the other members in the purchase group), between 2004 and November 2007 that the project was still moving forward and their deposit was safe

122.    After repeated assurances from Playground between 2004 and 2007 that the

project was moving forward and his deposit was not at risk, Mr. Allie (along with the other members in the purchase group) learned in 2008 that his deposit was lost.

123.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted the deposit paid jointly by the Kucharskis, Wingfields, LaRoccas, and Mr. Allie, and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

124.    In 2008, Mr. Allie (and the other members in the purchase group) learned that he would not recover any of their $204,360 deposit – of which $51,090 was paid by Mr. Allie.

125.    As explained above, Playground's negligent misrepresentations to Mr. Allie – and the other members of their purchase group – caused him damages.

126.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

**D.    PLAINTIFF WARREN ACKERMAN**

127.    Plaintiff Warren Ackerman resides in London.   Mr. Ackerman is an equity research analyst in London for Societe Generale.

128.    During 2003, prior to signing the contract, Mr. Ackerman traveled to Turks & Caicos to conduct due diligence on Veranda.

129.    Also during 2003, prior to signing the purchase contract, Mr. Ackerman was provided with the brochure in which Playground represented that his deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen

18

circumstances.

130.    The security of the deposit was an important factor in Mr. Ackerman's decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

131.    Relying on Playground's assurance that his deposit would be safe, Mr. Ackerman signed the purchase contract in 2003 and made the $290,000 deposit.

132.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Ackerman (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

133.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Mr. Ackerman (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

134.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mr. Ackerman's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

135.    In 2008, Mr. Ackerman (and the other Plaintiffs) learned that he would not recover any of his $290,000 deposit.

136.    As explained above, Playground's negligent misrepresentations to Mr. Ackerman – and the other Plaintiffs – caused him damages.

137.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs

because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

**E.      PLAINTIFF MARY BANNON**

138.    Plaintiff Mary Bannon resides in Massachusetts.  She is a private duty registered nurse.

139.    During 2004, a Playground representative solicited Ms. Bannon to purchase a Veranda unit.

140.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

141.    Based on the investment aspect of this transaction, Ms. Bannon was interested in investing in a unit in Veranda.

142.    During 2004, prior to signing the contract, Ms. Bannon traveled to Turks & Caicos to conduct due diligence on Veranda.

143.    Playground provided Ms. Bannon with the brochure in which it represented that her deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  She read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

144.    Further, during the months leading up to her purchase of a Veranda unit, the Playground representative (Bruce Skelley) represented that her deposit would be safe "in all

circumstances" and that it was "secure" and would be "gaining interest at Misick & Stanbrook."

145.    The security of the deposit was an important factor in Ms. Bannon's decision to purchase a Veranda unit.  She would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  She would not have purchased a Veranda unit had she known that her deposit would be lost if Cherokee went bankrupt.

146.    Relying on Playground's assurance that her deposit would be safe, Bannon signed the purchase contract and made the deposit of $95,180.

147.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Bannon (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and her deposit was safe.

148.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and her deposit was not at risk, Bannon (along with the other Plaintiffs) learned in 2008 that her deposit was lost.

149.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Bannon's deposit and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

150.    In 2008, Bannon (and the other Plaintiffs) learned that she would not recover any of her $95,180 deposit.

151.    As explained above, Playground's negligent misrepresentations to Bannon – and the other Plaintiffs – caused her damages.

152.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs

because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

**F.      PLAINTIFFS DENIS AND SUSAN BARRETT**

153.     Plaintiffs Denis and Susan Barrett reside in the United Kingdom, Surrey.

154.     During 2003, a Playground representative (Chad Rowe) solicited the Barretts to purchase a Veranda unit.

155.     Playground marketed Veranda as a real estate investment, more so than a vacation home.   Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

156.     Based on the investment aspect of this transaction, the Barretts were interested in investing in a unit in Veranda.

157.     Prior to signing the purchase contract, the Barretts traveled to Turks & Caicos to conduct research on Veranda.  At that time, the Playground representative (Mr. Rowe) provided them with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."   Playground Brochure at 2, Ex. A.   They read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

158.     Further, during the months leading up to his purchase of a Veranda unit, the Playground representative (Mr. Rowe) represented that their deposit would be "safe in all circumstances" and that they would receive back "100%" of their deposit "if the developer

defaulted on the contract."

159.    Lastly, Mr. Rowe sent an email to Mr. Barrett stating that the deposit would be protected during the two-year construction phase:

> Veranda will be a two year build.  That means that your investment is protected for two years, you earn 2% interest direct from me for two years.

February 26, 2004 email from Playground to the Barretts.

160.    The security of the deposit was an important factor in the Barretts' decision to purchase a Veranda unit.  They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances and that they would receive their deposit back should the developer default on the contract.  They would not have purchased a Veranda unit had they known that their deposit would be lost if Cherokee went bankrupt.

161.    Relying on Playground's assurance that their deposit would be safe, the Barretts' signed the purchase contract in 2003 and made the $1,110,000 deposit.

162.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured the Barretts (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

163.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, the Barretts (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

164.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted the Barretts' deposit and the deposits of all other Plaintiffs.

Cherokee ultimately filed for bankruptcy protection in Great Britain.

165.    In 2008, the Barretts' (and the other Plaintiffs) learned that they would not recover any of their $1,110,000 deposit.

166.    As explained above, Playground's negligent misrepresentations to the Barretts – and the other Plaintiffs – caused them damages.

167.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

G.    **PLAINTIFF BRIAN BARRY**

168.    Plaintiff Brian Barry resides in Ontario, Canada.   He owns Pinpoint GPS Solutions, a GPS tracking company.

169.    During the first half of 2003, a Playground representative solicited Mr. Barry to purchase a Veranda unit.

170.    Playground marketed Veranda as a real estate investment, more so than a vacation home.   Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

171.    Based on the investment aspect of this transaction, Ms. Barry was interested in investing in a unit in Veranda.

172.    In Spring 2003, prior to signing a purchase contract, Mr. Barry had several conversations with a Playground representative (Bruce Skelley) and several conversations with an Intrawest representative (Margaret Olson).   The Playground representative stated that this was

a "very secure investment" and Mr. Barry's deposit would be safe "in all circumstances." The Playground representative also represented that Cherokee (the developer) had "vast funds" and, therefore, Cherokee posed no risk to Mr. Barry's deposit. The Intrawest representative stated that this was a "great investment" and the deposit would be "safe in all circumstances."

173.   The security of the deposit was an important factor in Mr. Barry's decision to purchase a Veranda unit. He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances and that developer posed no risk to his deposit. He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

174.   Relying on Playground's assurance that his deposit would be safe, Mr. Barry signed the purchase contract a few months later in Summer 2003 and made the deposit of approximately $170,000.

175.   Thereafter, the construction of the Veranda project did not go as smoothly as promised. Nevertheless, Playground repeatedly assured Mr. Barry (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

176.   After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and his deposit was not at risk, Mr. Barry (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

177.   Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mr. Barry's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

178.   In 2008, Mr. Barry (and the other Plaintiffs) learned that he would not recover any

of his $170,000 deposit.

179.    As explained above, Playground's negligent misrepresentations to Mr. Barry –
and the other Plaintiffs – caused him damages.

180.    Moreover, Playground was unjustly enriched at the expense of Mr. Barry because
it received a benefit – millions in commissions – that came from money deposited by Mr. Barry
for a condominium that he never received.

## H.    PLAINTIFF JOEL BRODY AND ALAN MISHLOVE

181.    Plaintiff Joel Brody and Alan Mishlove reside in Illinois.   Mr. Brody is a
controller and manager of internal auditing with CJE Senior Life.

182.    During 2003, a Playground representative (Steve Cartner) solicited Mr. Brody and
Mr. Mishlove to purchase a Veranda unit.

183.    Playground marketed Veranda as a real estate investment, more so than a vacation
home.   Playground emphasized the potential capital gain owners would make through the
increase in value of their properties, along with the rental revenue they could receive each year
by renting their luxury property for use when they were not there (which would be most of the
time).

184.    Based on the investment aspect of this transaction, Mr. Brody and Mr. Mishlove
were interested in investing in a unit in Veranda.

185.    In 2003, prior to signing a purchase contract, Mr. Brody had several conversations
with the Playground representative (Mr. Cartner).   The Playground representative stated that
their deposit would be safe "in all circumstances."

186.    Also prior to signing a purchase contract, Mr. Brody was provided with the
brochure in which Playground represented that the deposit would "be held in an interest-bearing

trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period." Playground Brochure at 2, Ex. A. He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

187. The security of the deposit was an important factor in Mr. Brody's and Mr. Mishlove's decision to purchase a Veranda unit. They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances. They would not have purchased a Veranda unit had they known that their deposit would be lost if Cherokee went bankrupt.

188. Relying on Playground's assurance that their deposit would be safe, Mr. Brody and Mr. Mishlove signed the purchase contract in 2003 and each made a deposit of $33,900, for a total of $67,800.

189. Thereafter, the construction of the Veranda project did not go as smoothly as promised. Nevertheless, Playground repeatedly assured Mr. Brody and Mr. Mishlove (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

190. After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Mr. Brody and Mr. Mishlove (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

191. Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted their deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

192. In 2008, Mr. Brody and Mr. Mishlove (and the other Plaintiffs) learned that they would not recover any of their $67,800 deposit.

193.    As explained above, Playground's negligent misrepresentations to Mr. Brody and Mr. Mishlove – and the other Plaintiffs – caused them damages.

194.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

## I.    PLAINTIFFS MAURICE BYRNE AND SIOBHAN DEMPSEY

195.    Plaintiffs Maurice Byrne and Siobhan Dempsey reside in Ontario, Canada.  Mr. Byrne owns several businesses, including several restaurants in Intrawest Village at Blue Mountain, Ontario, Canada.

196.    During 2003, an Intrawest or Playground representative (Jeff Davis) solicited Mr. Byrne to purchase a Veranda unit.

197.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

198.    Based on the investment aspect of this transaction, Mr. Byrne was interested in investing in a unit in Veranda.

199.    Prior to signing the purchase contract, Mr. Byrne traveled to Turks & Caicos to conduct research on Veranda.  At that time, a Playground representative (Mr. Skelley) provided Mr. Byrne with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure

28

and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

200.    Further, during the months leading up to his purchase of a Veranda unit, the Playground representative (Mr. Skelley) represented that his deposit would be "safe in all circumstances" and that the "deposits would not be used for construction."

201.    The security of the deposit was an important factor in Mr. Byrne's decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances and would not be used for construction.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

202.    Relying on Playground's assurance that their deposit would be safe, Byrne and Dempsey signed the purchase contract in 2003 and made the $301,960 deposit.

203.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Byrne and Dempsey (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

204.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Byrne and Dempsey (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

205.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Byrne and Dempsey's deposit and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

206.    In 2008, Byrne and Dempsey (and the other Plaintiffs) learned that they would not

recover any of their $301,960 deposit.

207.    As explained above, Playground's negligent misrepresentations to Byrne and Dempsey – and the other Plaintiffs – caused them damages.

208.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

## J.    PLAINTIFFS CHRIS AND KATHLEEN COSTELLO

209.    Plaintiffs Chris and Kathleen Costello reside in Virginia, Henrico County.   Mr. Costello is an executive director of business development for a local company.

210.    During 2004, a Playground representative solicited the Costellos to purchase a Veranda unit.

211.    Playground marketed Veranda as a real estate investment, more so than a vacation home.   Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

212.    Based on the investment aspect of this transaction, the Costellos were interested in investing in a unit in Veranda.

213.    During the months leading up to his purchase of a Veranda unit, the Playground representative (Steve Cartner) represented that "there was no risk to the deposit because it was not needed for construction costs and will be returned with interest if anything happens to the project."

214.    Playground provided the Costellos with the brochure in which it represented that

their deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  They read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

215.   The security of the deposit was an important factor in the Costello's decision to purchase a Veranda unit.  They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  They would not have purchased a Veranda unit had they known that their deposit would be lost if Cherokee went bankrupt.

216.   Relying on Playground's assurance that their deposit would be safe, the Costello's signed the purchase contract in 2004 and made the deposit of $59,800.

217.   Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured the Costellos (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

218.   After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, the Costellos (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

219.   Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted the Costello's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

220.   In 2008, the Costellos (and the other Plaintiffs) learned that they would not recover any of their $59,800 deposit.

221.   As explained above, Playground's negligent misrepresentations to the Costellos –
and the other Plaintiffs – caused them damages.

**K.   PLAINTIFF DON I. DARROCH**

222.   Plaintiff Don I. Darroch resides in Ontario, Canada.  Mr. Darroch is a real estate
developer.

223.   During 2004, a Playground representative (Steve Cartner) solicited Mr. Darroch
to purchase a Veranda unit.

224.   Playground marketed Veranda as a real estate investment, more so than a vacation
home.  Playground emphasized the potential capital gain owners would make through the
increase in value of their properties, along with the rental revenue they could receive each year
by renting their luxury property for use when they were not there (which would be most of the
time).

225.   Based on the investment aspect of this transaction, Mr. Darroch was interested in
investing in a unit in Veranda.

226.   Prior to signing the purchase contract, Mr. Darroch traveled to Turks & Caicos to
tour Veranda, and at that time the Playground representative (Mr. Cartner) provided Mr. Darroch
with the brochure in which Playground represented that the deposit would "be held in an interest-
bearing trust account, ensuring you are protected from any unforeseen circumstances, right
through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and
noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

227.   Further, during the months leading up to his purchase of a Veranda unit, a
Playground representative (Mr. Cartner) stated that his deposit would be "safe in all
circumstances" and that he would receive his deposit back should there be any issues with

construction.   The Playground representative (Mr. Cartner) also stated that unlike most other Turks & Caicos developments where the deposit would be used for construction, the deposit for Veranda would not be used for construction but, rather, would only facilitate obtaining construction financing.   Lastly, the Playground representative (Mr. Cartner) stated that Mr. Darroch's deposit would remain in trust with the Canadian law firm, McCarthy Tetrault, because the purchase contract was executed in Canada and, therefore, Canadian condo rules applied regarding deposits.

228.   The security of the deposit was an important factor in Mr. Darroch's decision to purchase a Veranda unit.   He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances, and that it would be held in trust in a Canadian law firm in accordance with Canadian condo rules.   He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

229.   Relying on Playground's assurance that his deposit would be safe, Mr. Darroch signed the purchase contract in 2004 and made the $100,000 deposit.

230.   Thereafter, the construction of the Veranda project did not go as smoothly as promised.   Nevertheless, Playground repeatedly assured Mr. Darroch (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

231.   After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and his deposit was not at risk, Mr. Darroch (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

232.   Between 2004 and 2007, the company in charge of constructing the Veranda

resort, Cherokee, exhausted Mr. Darroch's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

233.    In 2008, Mr. Darroch (and the other Plaintiffs) learned that he would not recover any of his $100,000 deposit.

234.    As explained above, Playground's negligent misrepresentations to Mr. Darroch – and the other Plaintiffs – caused him damages.

235.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

## L.    PLAINTIFFS GEORGE AND MARILYN A. DREYER

236.    Plaintiffs George and Marilyn Dreyer reside in Massachusetts.  They are retired.

237.    During 2004, a Playground representative (Chad Rowe) solicited the Dreyers to purchase a Veranda unit.

238.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

239.    Based on the investment aspect of this transaction, the Dreyers were interested in investing in a unit in Veranda.

240.    The Dreyers visited Turks & Caicos and toured Veranda.

241.    The Dreyers corresponded with a Playground representative (Mr. Rowe) on several occasions before signing the purchase contract and making the deposit.  The Playground

representative repeatedly assured them that their deposit would be safe in all circumstances, including if the developer defaulted on the purchase contract. The Playground representative confirmed this in a March 29, 2004 email to the Dreyers:

> The total amount deposited is guaranteed against default on our part and WILL earn you 2% interest during the construction period.

March 29, 2004 email from Playground to the Dreyers (emphasis in original).

242.   The security of the deposit was an important factor in the Dreyers' decision to purchase a Veranda unit. They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe and secure even if Cherokee defaulted on the purchase contract. They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances. They would not have purchased a Veranda unit had they known that their deposit would be lost if Cherokee went bankrupt.

243.   Relying on Playground's assurance that their deposit would be safe, the Dreyers signed the purchase contract in 2004 and made the $159,000 deposit.

244.   Thereafter, the construction of the Veranda project did not go as smoothly as promised. Nevertheless, Playground repeatedly assured the Dreyers (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

245.   After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, the Dreyers (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

246.   Between 2004 and 2007, the company in charge of constructing the Veranda

resort, Cherokee, exhausted the Dreyer's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

247.    In 2008, the Dreyers (and the other Plaintiffs) learned that they would not recover any of their $159,000 deposit.

248.    As explained above, Playground's negligent misrepresentations to the Dreyers – and the other Plaintiffs – caused them damages.

249.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

## M.    PLAINTIFFS KENNETH AND KATHLEEN GOODMAN AND DENNIS AND KIM WEIHS

250.    Plaintiffs Kenneth and Kathleen Goodman reside in Nassau County, New York, as do Plaintiffs Dennis and Kim Weihs.  Mr. Weihs has been a CPA for twenty-nine years and Mr. Goodman is a certified radiologist.

251.    During 2004, a Playground representative (Bruce Skelley) solicited Mr. Weihs to purchase a Veranda unit.

252.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

253.    Based on the investment aspect of this transaction, the Goodmans and Weihs were interested in investing in a unit in Veranda.

36

254.    Prior to signing the purchase contract, a Playground representative (Mr. Skelley) provided Mr. Weihs with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

255.    Further, during the months leading up to his purchase of a Veranda unit, the Playground representative (Mr. Skelley) represented to Mr. Weihs, when Mr. Weihs was in New York, that his deposit would be "safe in all circumstances," "was guaranteed," and that this transaction was a "no lose situation."

256.    The security of the deposit was an important factor in the Goodman's and Weihs' decision to purchase a Veranda unit.  They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances, "was guaranteed," and that this was a "no lose situation."  They would not have purchased a Veranda unit had they known that their deposit would be lost if Cherokee went bankrupt.

257.    Relying on Playground's assurance that their deposit would be safe, they signed the purchase contract and made the $80,000 deposit.

258.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured the Goodmans and Weihs (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

259.    After repeated assurances from Playground between 2004 and 2007 that the

37

project was moving forward and their deposit was not at risk, the Goodmans and Weihs (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

260.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted their deposit and the deposits of all other Plaintiffs.   Cherokee ultimately filed for bankruptcy protection in Great Britain.

261.    In 2008, the Goodmans and Weihs (and the other Plaintiffs) learned that they would not recover any of their $80,000 deposit.

262.    As explained above, Playground's negligent misrepresentations to Mr. Weihs (and the Goodmans through Mr. Weihs) – and the other Plaintiffs – caused them damages.

263.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

**N.    PLAINTIFF BOBBY C. GREEN**

264.    Plaintiff Bobby C. Green resides Miami Dade County, Florida.

265.    During  2004, a Playground representative solicited Green to purchase a Veranda unit.

266.    Playground marketed Veranda as a real estate investment, more so than a vacation home.   Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

267.    Based on the investment aspect of this transaction, Green was interested in investing in a unit in Veranda.

268.     Playground provided Mr. Green with the brochure in which it represented that his deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period." Playground Brochure at 2, Ex. A. He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

269.     The security of the deposit was an important factor in Mr. Green's decision to purchase a Veranda unit. He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances. He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

270.     Relying on Playground's assurance that his deposit would be safe, Green signed the purchase contract in 2004 and made the $56,980 deposit.

271.     Thereafter, the construction of the Veranda project did not go as smoothly as promised. Nevertheless, Playground repeatedly assured Green (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

272.     After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Green (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

273.     Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Green's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

274.     In 2008, Green (and the other Plaintiffs) learned that he would not recover any of his $56,980 deposit.

275.    As explained above, Playground's negligent misrepresentations to Green – and the other Plaintiffs – caused him damages.

**O.      PLAINTIFF GEORGINA HAMILTON (FELTON)**

276.    Plaintiff Georgina Hamilton (Felton) resides in England.  She is a part time management consultant and is training for a Masters in psychotherapy and counseling.

277.    During 2004, a Playground representative (Chad Rowe) solicited Ms. Hamilton to purchase a Veranda unit.

278.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

279.    Based on the investment aspect of this transaction, Ms. Hamilton was interested in investing in a unit in Veranda.

280.    Prior to signing the purchase contract, Ms. Hamilton traveled to Turks & Caicos to conduct research on Veranda.

281.    Further, during the months leading up to her purchase of a Veranda unit, the Playground representative (Mr. Rowe) represented that her deposit would be "safe in all circumstances."

282.    The security of the deposit was an important factor in Ms. Hamilton's decision to purchase a Veranda unit.  She would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  She would not have purchased a Veranda unit had she known that her deposit

would be lost if Cherokee went bankrupt.

283.    Relying on Playground's assurance that her deposit would be safe, Hamilton signed the purchase contract in 2004 and made the $159,180 deposit.

284.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.   Nevertheless, Playground repeatedly assured Hamilton (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and her deposit was safe.

285.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and her deposit was not at risk, Hamilton (along with the other Plaintiffs) learned in 2008 that her deposit was lost.

286.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Hamilton's deposit and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

287.    In 2008, Hamilton (and the other Plaintiffs) learned that she would not recover any of her $159,180 deposit, which represented her life savings.

288.    As explained above, Playground's negligent misrepresentations to Hamilton – and the other Plaintiffs – caused her damages.

289.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

## P.    PLAINTIFFS MICHAEL AND JANET HUMPHRIES

290.    Plaintiffs Michael and Janet Humphries reside in Surrey, England.   Mr. Humphries owns a company involved in the meat industry and Mrs. Humphries is a speech

therapist who works with patients diagnosed with head and neck cancer.

291.    During the first half of 2004, a Playground representative (Taz Brown) solicited the Humphries to purchase a Veranda unit.

292.    Playground marketed Veranda as a real estate investment, more so than a vacation home.   Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

293.    Based on the investment aspect of this transaction, the Humphries were interested in investing in a unit in Veranda.

294.    In the months leading up to their purchase, the Playground representative (Mr. Brown) represented to the Humphries on several occasions that their deposit would be "completely safe in all circumstances."   Further, the Playground representative provided the Humphries with the brochure in which Playground represented that their deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."   Playground Brochure at 2, Ex. A.   They read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

295.    The security of the deposit was an important factor in the Humphries' decision to purchase a Veranda unit.   They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.   They would not have purchased a Veranda unit had they known that their deposit would be lost if Cherokee went bankrupt.

296.    Relying on Playground's assurance that their deposit would be safe, Mr. Humphries signed the purchase contract in 2004 and made the $79,180 deposit.

297.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured the Humphries (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

298.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, the Humphries (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

299.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted the Humphries' deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

300.    In 2008, the Humphries (and the other Plaintiffs) learned that they would not recover any of their $79,180 deposit.

301.    As explained above, Playground's negligent misrepresentations to the Humphries – and the other Plaintiffs – caused them damages.

302.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

Q.    **PLAINTIFF WILLIAM KELLY**

303.    Plaintiff William Kelly resides in Fairfield, Connecticut.  He has been a securities trader at Oaktree Capital Management for the past ten years.

304.    During the first half of 2003, Playground representative (Chad Rowe) solicited

Mr. Kelly to purchase a Veranda unit.

305.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

306.    Based on the investment aspect of this transaction, Mr. Kelly was interested in investing in a unit in Veranda.

307.    In 2003, prior to signing a purchase contract, Mr. Kelly had several conversations with the Playground representative (Mr. Rowe).  The Playground representative stated that his deposit would be safe "in all circumstances."

308.    Also prior to signing a purchase contract, he was provided with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

309.    The security of the deposit was an important factor in Mr. Kelly's decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

310.    Relying on Playground's assurance that his deposit would be safe, Mr. Kelly signed the purchase contract and made the deposit of approximately $95,180.

311.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Kelly (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

312.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and his deposit was not at risk, Mr. Kelly (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

313.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mr. Kelly's deposit and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

314.    In 2008, Mr. Kelly (and the other Plaintiffs) learned that he would not recover any of his $95,180 deposit.

315.    As explained above, Playground's negligent misrepresentations to Mr. Kelly – and the other Plaintiffs – caused him damages.

316.    Moreover, Playground was unjustly enriched at the expense of Mr. Kelly because it received a benefit – millions in commissions – that came from money deposited by Mr. Kelly for a condominium that he never received.

**R.     PLAINTIFF NIGEL P. KENNETT**

317.    Plaintiff Nigel P. Kennett resides in London.  Mr. Kennett is an equity fund manager in London, and has been for twenty-two years.

318.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year

by renting their luxury property for use when they were not there (which would be most of the time).

319.    Based on the investment aspect of this transaction, Mr. Kennett was interested in investing in a unit in Veranda.

320.    During 2004, prior to signing a purchase contract, Mr. Kennett was provided with the brochure (Exhibit A) in which Playground represented that his deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

321.    The security of the deposit was an important factor in Mr. Kennett's decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

322.    Relying on Playground's assurance that his deposit would be safe, Kennett signed the purchase contract in 2004 and made the $369,900 deposit.

323.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Kennett (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

324.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and his deposit was not at risk, Mr. Kennett (along with the other

Plaintiffs) learned in 2008 that his deposit was lost.

325.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mr. Kennett's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

326.    In 2008, Mr. Kennett (and the other Plaintiffs) learned that he would not recover any of his $369,900 deposit.

327.    As explained above, Playground's negligent misrepresentations to Mr. Kennett – and the other Plaintiffs – caused him damages.

328.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

**S.    PLAINTIFF GARRETT KENNY**

329.    Plaintiff Garrett Kenny resides in Orange County, Florida.  Mr. Kenny has worked in the real estate industry with Feltrim Developments since 1995.

330.    During 2004, a Playground representative solicited Mr. Kenny to purchase a Veranda unit.

331.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

332.    Based on the investment aspect of this transaction, Mr. Kenny was interested in investing in a unit in Veranda.

333.   Prior to signing the purchase contract, a Playground representative (Taz Brown) made several representations to Mr. Kenny that the deposit would be safe under "any and all circumstances."

334.   The security of the deposit was an important factor in Mr. Kenny's decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe and secure in all circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

335.   Relying on Playground's assurance that his deposit would be safe, Mr. Kenny signed the purchase contract in 2004 and made the $92,000 deposit.

336.   Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Kenny (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

337.   After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Mr. Kenny (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

338.   Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mr. Kenny's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

339.   In 2008, Mr. Kenny (and the other Plaintiffs) learned that he would not recover any of his $92,000 deposit.

340.   As explained above, Playground's negligent misrepresentations to Mr. Kenny –

and the other Plaintiffs – caused him damages.

**T.   PLAINTIFF VANESSA S. KIM**

341.    Plaintiff Vanessa S. Kim resides in Ontario, Canada.   Ms. Kim is a Senior Director of Business Development and Strategic Accounts for EK3 Technologies, Inc.

342.    During 2003, several Playground representatives (Gerry Wayland, Steve Cartner, and Chris Lankhorst) solicited Ms. Kim to purchase a Veranda unit.

343.    Playground marketed Veranda as a real estate investment, more so than a vacation home.   Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

344.    Based on the investment aspect of this transaction, Kim was interested in investing in a unit in Veranda.

345.    In 2003, prior to signing a purchase contract, Ms. Kim had several conversations with Playground representatives (Wayland, Cartner, and Lankhorst).   The Playground representatives stated that Ms. Kim's deposit would be safe "in all circumstances."

346.    The security of the deposit was an important factor in Ms. Kim's decision to purchase a Veranda unit.   She would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances.   She would not have purchased a Veranda unit had she known that her deposit would be lost if Cherokee went bankrupt.

347.    Relying on Playground's assurance that her deposit would be safe, Ms. Kim signed the purchase contract in 2004 and made the $77,980 deposit.

49

348.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.   Nevertheless, Playground repeatedly assured Ms. Kim (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and her deposit was safe.

349.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and her deposit was not at risk, Ms. Kim (along with the other Plaintiffs) learned in 2008 that her deposit was lost.

350.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Ms. Kim's deposit and the deposits of all other Plaintiffs.   Cherokee ultimately filed for bankruptcy protection in Great Britain.

351.    In 2008, Ms. Kim (and the other Plaintiffs) learned that she would not recover any of her $77,980 deposit.

352.    As explained above, Playground's negligent misrepresentations to Ms. Kim – and the other Plaintiffs – caused her damages.

353.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

**U.    PLAINTIFFS RICHARD AND KRISTINE KRAMER**

354.    Plaintiffs Richard and Kristine Kramer reside in Dupage County, Illinois.   Mr. Kramer owns Kramer Builders.

355.    During the first half of 2004, a Playground representative (Chad Rowe) solicited the Kramers to purchase a Veranda unit.

356.    Playground marketed Veranda as a real estate investment, more so than a vacation

home.   Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

357.    Based on the investment aspect of this transaction, the Kramers were interested in investing in a unit in Veranda.

358.    Prior to signing the purchase contract, the Playground representative (Mr. Rowe) provided the Kramers with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  They read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

359.    Further, during the months leading up to their purchase of a Veranda unit, the Playground representative (Mr. Rowe) represented that their deposit would be "safe in all circumstances."

360.    The security of the deposit was an important factor in the Kramers' decision to purchase a Veranda unit.  They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  They would not have purchased a Veranda unit had they known that their deposit would be lost if Cherokee went bankrupt.

361.    Relying on Playground's assurance that their deposit would be safe, the Kramers signed the purchase contract in 2004 and made the $159,180 deposit.

362.    Thereafter, the construction of the Veranda project did not go as smoothly as

promised.   Nevertheless, Playground repeatedly assured the Kramers (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

363.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, the Kramers (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

364.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted the Kramers' deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

365.    In 2008, the Kramers (and the other Plaintiffs) learned that they would not recover any of their $159,180 deposit.

366.    As explained above, Playground's negligent misrepresentations to the Kramers – and the other Plaintiffs – caused them damages.

367.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

## V.    PLAINTIFF CHARLES E. LARSEN

368.    Plaintiff Charles E. Larsen resides in Ontario, Canada.

369.    During 2004, a Playground representative solicited Larsen to purchase a Veranda unit.

370.    Playground marketed Veranda as a real estate investment, more so than a vacation home.   Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year

by renting their luxury property for use when they were not there (which would be most of the time).

371.    Based on the investment aspect of this transaction, Larsen was interested in investing in a unit in Veranda.

372.    During the months leading up to his purchase of a Veranda unit, a Playground representative (Bruce Skelley) represented that his deposit would be "safe in all circumstances."

373.    Playground provided Larsen with the brochure in which it represented that his deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

374.    Further, Mr. Skelley sent Mr. Larsen an email representing that the deposit would be kept in trust:  "we require only 20% on selection day and it is kept in trust."  March 13, 2003 email from Playground to Mr. Larsen.

375.    Lastly, Playground representative Margaret Olson wrote at length to Mr. Larsen about the due diligence that Playground conducted into the developer who ultimately went bankrupt:

> When Intrawest chooses a developer to work with they look for certain criteria, namely: the type of development, the location, the people and their *capitalization* and their attitude.  So in other words, *they do comprehensive due diligence*.
> . . .
> The development owner has 100M in assets.  The cost of the development will run 90M but the owner is only applying for 20M dollars to complete – *so it is well funded*.

May 6, 2003 email from Playground to Mr. Larsen (emphasis added).

376.    The security of the deposit was an important factor in Mr. Larsen's decision to

purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

377.   Relying on Playground's assurance that his deposit would be safe, Larsen signed the purchase contract in 2004 and made the $73,980 deposit.

378.   Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Larsen (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

379.   After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and his deposit was not at risk, Larsen (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

380.   Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Larsen's deposit and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

381.   In 2008, Larsen (and the other Plaintiffs) learned that he would not recover any of his $73,980 deposit.

382.   As explained above, Playground's negligent misrepresentations to Larsen – and the other Plaintiffs – caused him damages.

383.   Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

**W.     PLAINTIFF MARC LETOURNEAU AND MEEGAN HINDS**

384.    Plaintiffs Marc Letourneau and Meegan Hinds reside in Ontario, Canada.  Mr. Letourneau is an executive search partner with Korn/Ferry International.

385.    During the first half of 2003, a Playground representative (Clay Anthony) solicited Mr. Letourneau and Ms. Hinds to purchase a Veranda unit.

386.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

387.    Based on the investment aspect of this transaction, Mr. Letourneau and Ms. Hinds were interested in investing in a unit in Veranda.

388.    In the few months leading up to Mr. Letourneau and Ms. Hinds signing a purchase contract in 2003, they visited Veranda and met with a Playground representative (Mr. Anthony) who provided them with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  They read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

389.    Further, during the months leading up to their purchase of a Veranda unit, the Playground representative (Mr. Anthony) represented in correspondence that their deposit would be safe "in all circumstances."

390.    The security of the deposit was an important factor in their decision to purchase a

Veranda unit.   They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  They would not have purchased a Veranda unit had they known that their deposit would be lost if Cherokee went bankrupt.

391.    Relying on Playground's assurance that their deposit would be safe, they signed the purchase contract in 2004 and made the $69,980 deposit.

392.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Letourneau and Ms. Hinds (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

393.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Mr. Letourneau and Ms. Hinds (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

394.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted their deposit and the deposits of all other Plaintiffs.   Cherokee ultimately filed for bankruptcy protection in Great Britain.

395.    In 2008, Mr. Letourneau and Ms. Hinds (and the other Plaintiffs) learned that they would not recover any of their $69,980 deposit.

396.    As explained above, Playground's negligent misrepresentations to Mr. Letourneau and Ms. Hinds – and the other Plaintiffs – caused them damages.

397.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

## X.  PLAINTIFFS STEWART LONKY AND PARYUS PATEL

398.   Plaintiffs Steward Lonky, M.D. and Paryus Patel, M.D. reside in Los Angeles County, California.  Lonky and Patel are physicians in California.

399.   During the first half of 2004, a Playground representative solicited Lonky and Patel to purchase a Veranda unit.

400.   Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

401.   Based on the investment aspect of this transaction, Lonky and Patel were interested in investing in a unit in Veranda.

402.   Playground provided Lonky and Patel with the brochure in which it represented that their deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  They read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

403.   Further, during the months leading up to their purchase of a Veranda unit, the Playground representative (Ms. Bergstrand) represented that their deposit would be safe "in all circumstances."  The security of the deposit was an important factor in their decision to purchase a Veranda unit.

404.   They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen

circumstances.  They would not have purchased a Veranda unit had they known that their deposit would be lost if Cherokee went bankrupt.

405.   Relying on Playground's assurance that their deposit would be safe, Lonky and Patel signed the purchase contract in 2004 and made the $126,980 deposit.

406.   Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Lonky and Patel (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

407.   After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Lonky and Patel (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

408.   Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted the Lonky's and Patel's deposit and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

409.   In 2008, Lonky and Patel (and the other Plaintiffs) learned that they would not recover any of their $126,980 deposit.

410.   As explained above, Playground's negligent misrepresentations to Lonky and Patel – and the other Plaintiffs – caused them damages.

**Y.   PLAINTIFFS JEFF MATHENY**

411.   Plaintiff Jeff Matheny resides in Wood County, West Virginia.  He is currently President of a Physician's Business Office.

412.   During the first half of 2003, a Playground representative (Bruce Skelley) solicited Mr. Matheny to purchase a Veranda unit.

413.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

414.    Based on the investment aspect of this transaction, Matheny was interested in investing in a unit in Veranda.

415.    During the months leading up to his purchase of a Veranda unit, the Playground representative (Mr. Skelley) represented that his deposit would be "safe in all circumstances" and that the "deposits would not be used for construction."

416.    In the few months leading up to Mr. Matheny signing a purchase contract in 2003, he visited Veranda and met with a Playground representative who provided him with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

417.    The security of the deposit was an important factor in Mr. Matheny's decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

418.    Relying on Playground's assurance that their deposit would be safe, Mr. Matheny signed the purchase contract in 2003 and made the $150,000 deposit – $75,000 of which was

paid by Mr. Matheny, while $75,000 was paid by Mr. Pantelidis for their joint purchase.

419.     Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Matheny (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

420.     After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and his deposit was not at risk, Mr. Matheny (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

421.     Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Matheny's deposit and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

422.     In 2008, Mr. Matheny (and the other Plaintiffs) learned that he would not recover any of his $150,000 deposit – of which $75,000 was paid by Mr. Matheny.

423.     As explained above, Playground's negligent misrepresentations to Mr. Matheny – and the other Plaintiffs – caused him damages.

424.     Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

## Z.     PLAINTIFF PRADEEP MEHTA

425.     Plaintiff Pradeep Mehta resides in the United Kingdom.

426.     During 2004, a Playground representative solicited Mehta to purchase a Veranda unit.

427.     Playground marketed Veranda as a real estate investment, more so than a vacation

home.   Playground  emphasized  the  potential  capital  gain  owners  would  make  through  the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

428.   Based  on  the  investment  aspect  of  this  transaction,  Mehta  was  interested  in investing in a unit in Veranda.

429.   Playground  provided  Mehta  with  the  brochure  in  which  it  represented  that  the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

430.   The  security  of  the  deposit  was  an  important  factor  in  Mehta's  decision  to purchase a Veranda unit.  Mehta would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  Mehta would not have purchased a Veranda unit had he known that the deposit would be lost if Cherokee went bankrupt.

431.   Relying on Playground's assurance that the deposit would be safe, Mehta signed the purchase contract in 2004 and made the $72,000 deposit.

432.   Thereafter,  the  construction  of  the  Veranda  project  did  not  go  as  smoothly  as promised.  Nevertheless, Playground repeatedly assured Mehta (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and the deposit was safe.

433.   After  repeated  assurances  from  Playground  between  2004  and  2007  that  the project  was  moving  forward  and  the  deposit  was  not  at  risk,  Mehta  (along  with  the  other

Plaintiffs) learned in 2008 that the deposit was lost.

434.     Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mehta's deposit and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

435.     In 2008, Mehta (and the other Plaintiffs) learned that he would not recover any of the $72,000 deposit.

436.     As explained above, Playground's negligent misrepresentations to Mehta – and the other Plaintiffs – caused him damages.

437.     Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

## AA.    PLAINTIFF ANASTASIOS PANTELIDIS

438.     Plaintiff Anastasios Pantelidis resides in Washington County, Ohio.

439.     During 2004, a Playground representative solicited Pantelidis to purchase a Veranda unit.

440.     Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

441.     Based on the investment aspect of this transaction, Pantelidis was interested in investing in a unit in Veranda.

442.     Playground provided Pantelidis with the brochure in which it represented that

their deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

443.    The security of the deposit was an important factor in his decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

444.    Relying on Playground's assurance that his deposit would be safe, Pantelidis signed the purchase contract in 2004 and made the $150,000 deposit – $75,000 of which was paid by Mr. Pantelidis, while $75,000 was paid by Mr. Matheny for their joint purchase.

445.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Pantelidis (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

446.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and his deposit was not at risk, Pantelidis (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

447.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Pantelidis' deposit and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

448.    In 2008, Pantelidis (and the other Plaintiffs) learned that he would not recover any

of his $150,000 deposit – $75,000 of which was paid by Mr. Pantelidis.

449.     As explained above, Playground's negligent misrepresentations to Pantelidis – and the other Plaintiffs – caused him damages.

## BB.     PLAINTIFF PAUL PERKINS

450.     Plaintiff Paul Perkins resides in Ontario, Canada.  Mr. Perkins is President of Zebra Studios, a full service marketing firm headquartered in Toronto, Canada.

451.     During Spring 2003, a Playground representative (Clay Anthony) solicited Mr. Perkins to purchase a Veranda unit.

452.     Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

453.     Based on the investment aspect of this transaction, Mr. Perkins was interested in investing in a unit in Veranda.

454.     In the few months leading up to Mr. Perkins signing a purchase contract in 2003, the Playground representative (Mr. Anthony) provided Mr. Perkins with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

455.     Further, during the months leading up to his purchase of a Veranda unit, the Playground representative (Mr. Anthony) represented that his deposit would be safe.

456.   The security of the deposit was an important factor in Mr. Perkins' decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

457.   Relying on Playground's assurance that his deposit would be safe, Perkins signed the purchase contract in 2003 and made the $145,980 deposit.

458.   Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Perkins (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

459.   After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Mr. Perkins (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

460.   Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mr. Perkins' deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

461.   In 2008, Mr. Perkins (and the other Plaintiffs) learned that he would not recover any of his $145,980 deposit.

462.   As explained above, Playground's negligent misrepresentations to Mr. Perkins – and the other Plaintiffs – caused him damages.

463.   Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by

Plaintiffs for condominiums that they never received.

**CC.   PLAINTIFFS DALE AND DOREEN PETROVITCH**

464.    Plaintiffs Dale and Doreen Petrovitch reside in Delaware County, Pennsylvania. Mr. Petrovitch is the owner of RCS and MCI-2 Communications, 2-way radio businesses near Philadelphia.

465.    During 2003, a Playground representative (Bruce Skelley) solicited the Petrovitchs to purchase a Veranda unit.

466.    Playground marketed Veranda as a real estate investment, more so than a vacation home.   Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

467.    Based on the investment aspect of this transaction, the Petrovitchs were interested in investing in a unit in Veranda.

468.    They spoke with a Playground representative (Mr. Skelley) on several occasions before signing the purchase contract and making the deposit.   The Playground representative repeatedly assured them that their deposit would be safe in all circumstances.

469.    Prior to signing the purchase contract, they traveled to Turks & Caicos to tour Veranda.   Playground provided them with the brochure in which it represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."   Playground Brochure at 2, Ex. A.   They read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

470.    The security of the deposit was an important factor in the Petrovitchs' decision to purchase a Veranda unit.  They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe and secure.  They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  They would not have purchased a Veranda unit had they known that their deposit would be lost if Cherokee went bankrupt.

471.    Relying on Playground's assurance that their deposit would be safe, the Petrovitchs signed the purchase contract in 2003 and made the $180,000 deposit.

472.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured the Petrovitchs (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

473.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, the Petrovitchs (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

474.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted the Petrovitchs' deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

475.    In 2008, the Petrovitchs (and the other Plaintiffs) learned that they would not recover any of their $180,000 deposit.

476.    As explained above, Playground's negligent misrepresentations to the Petrovitchs – and the other Plaintiffs – caused them damages.

477.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs

because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

**DD.     PLAINTIFFS CAL PYE AND MICHELLE ROGERS**

478.    Plaintiffs Cal Pye and Michelle Rogers reside in British Columbia, Canada.

479.    During 2004, a Playground representative solicited Pye and Rogers to purchase a Veranda unit.

480.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

481.    Based on the investment aspect of this transaction, Pye and Rogers were interested in investing in a unit in Veranda.

482.    Playground provided Pye and Rogers with the brochure in which it represented that their deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  They read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

483.    Further, during Playground's Bayshore presentation in Vancouver, Pye and Rogers spoke with Playground representative Chad Rowe about Veranda including the deposit. Mr. Rowe represented that their deposit would be "safe in all circumstances."  Still further, when they traveled to Turks & Caicos months later to learn more about Veranda, they spoke with Playground representative Clay Anthony who again reiterated that their deposit would be "safe

in all circumstances."

484.    The security of the deposit was an important factor in their decision to purchase a Veranda unit.    They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  They would not have purchased a Veranda unit had they known that their deposit would be lost if Cherokee went bankrupt.

485.    Relying on Playground's assurance that their deposit would be safe, Pye and Rogers signed the purchase contract in 2004 and made the $164,379 deposit.

486.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Pye and Rogers (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

487.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Pye and Rogers (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

488.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted the Pye and Rogers's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

489.    In 2008, Pye and Rogers (and the other Plaintiffs) learned that they would not recover any of their $164,379 deposit.

490.    As explained above, Playground's negligent misrepresentations to Pye and Rogers – and the other Plaintiffs – caused them damages.

491.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs

because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

## EE.    PLAINTIFF TOM RAY

492.    Plaintiff Tom Ray resides in Surrey, United Kingdom.   Mr. Ray is Regional Director for Pernod Ricard, a global drinks company.

493.    During 2004, a Playground representative (Chad Rowe) solicited Mr. Ray to purchase a Veranda unit.

494.    Playground marketed Veranda as a real estate investment, more so than a vacation home.   Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

495.    Based on the investment aspect of this transaction, Mr. Ray was interested in investing in a unit in Veranda.

496.    Prior to signing the purchase contract, Mr. Ray met with the Playground representative (Mr. Rowe) in London.   At that time, the Playground representative (Mr. Rowe) provided Mr. Ray with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."   Playground Brochure at 2, Ex. A.   He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

497.    The security of the deposit was an important factor in Mr. Ray's decision to purchase a Veranda unit.   He would not have purchased a Veranda unit but-for Playground's

representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

498.   Relying on Playground's assurance that his deposit would be safe, Mr. Ray signed the purchase contract in 2004 and made the $90,000 deposit.

499.   Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Ray (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

500.   After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and his deposit was not at risk, Mr. Ray (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

501.   Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mr. Ray's deposit and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

502.   In 2008, Mr. Ray (and the other Plaintiffs) learned that he would not recover any of his $90,000 deposit.

503.   As explained above, Playground's negligent misrepresentations to Mr. Ray – and the other Plaintiffs – caused him damages.

504.   Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

**FF.     PLAINTIFFS STUART AND LAURIE RICE**

505.     Plaintiff Stuart and Laurie Rice reside in Los Angeles County, California.  Mr. Rice is a Superior Court Judge in Los Angeles and Mrs. Rice is an associate attorney at the law firm of Bird & Bird.

506.     During the first half of 2004, a Playground representative solicited the Rices to purchase a Veranda unit.

507.     Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

508.     Based on the investment aspect of this transaction, the Rices were interested in investing in a unit in Veranda.

509.     Prior to signing the purchase contract, the Rices traveled to Turks & Caicos and toured Veranda.  The Playground representative provided them with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  They read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

510.     The Playground representative also stated that their deposit would be "safe in all circumstances," would be placed in an interest-bearing account, and that none of their deposit would go toward construction costs.  Although the Rices do not remember the name of the Playground representative who made the representations to them regarding the security of the

deposit, they do remember what he looked like and will be able to identify him by name during the discovery phase.

511.    The security of the deposit was an important factor in the Rice's decision to purchase a Veranda unit.  They would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances and would be placed in an interest-bearing account, and that none of their deposit would go toward construction costs.  They would not have purchased a Veranda unit had he known that their deposit would be lost if Cherokee went bankrupt.

512.    Relying on Playground's assurance that their deposit would be safe, the Rices signed the purchase contract in 2004 and made the $92,000 deposit.

513.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured the Rices (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and their deposit was safe.

514.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, the Rices (along with the other Plaintiffs) learned in 2008 that their deposit was lost.

515.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted the Rices' deposit and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

516.    In 2008, the Rices (and the other Plaintiffs) learned that they would not recover any of their $92,000 deposit.

517.    As explained above, Playground's negligent misrepresentations to the Rices – and

the other Plaintiffs – caused them damages.

**GG.   PLAINTIFF ROBERT SEGUIN**

518.     Plaintiff Robert Seguin resides in Ontario, Canada.  Mr. Seguin is a Portfolio Manager with TD Waterhouse Private Investment Counsel, Inc.

519.     During 2003, a Playground representative (Kristina Bergstrand) solicited Mr. Seguin to purchase a Veranda unit.

520.     Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

521.     Based on the investment aspect of this transaction, Mr. Seguin was interested in investing in a unit in Veranda.

522.     Prior to signing the purchase contract, Mr. Seguin traveled to Turks & Caicos to conduct research on Veranda.   At that time, the Playground representative (Ms. Bergstrand) provided Mr. Seguin with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

523.     Further, during the months leading up to his purchase of a Veranda unit, the Playground representative (Ms. Bergstrand) represented that his deposit would be "safe in all circumstances" and that he would receive his deposit back should there be any issues with

construction.

524.    The security of the deposit was an important factor in Mr. Seguin's decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances and that he would receive his deposit back should there be any issues with construction.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

525.    Relying on Playground's assurance that his deposit would be safe, Mr. Seguin signed the purchase contract in 2003 and made the $68,000 deposit.

526.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Seguin (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

527.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Mr. Seguin (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

528.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mr. Seguin's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

529.    In 2008, Mr. Seguin (and the other Plaintiffs) learned that he would not recover any of his $68,000 deposit.

530.    As explained above, Playground's negligent misrepresentations to Mr. Seguin – and the other Plaintiffs – caused him damages.

531.     Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

## HH.     PLAINTIFF JOHN STOCKTON

532.     Plaintiff John Stockton resides in Ontario, Canada.  Mr. Stockton is a Portfolio and Investment Advisor with CIBC Wood Gundy.

533.     During 2003, a Playground representative (Ms. Kristina Bergstrand) solicited Mr. Stockton to purchase a Veranda unit.

534.     Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

535.     Based on the investment aspect of this transaction, Mr. Stockton was interested in investing in a unit in Veranda.

536.     Prior to signing the purchase contract, Mr. Stockton traveled to Turks & Caicos to conduct research on Veranda.  At that time, the Playground representative (Ms. Bergstrand) provided Mr. Stockton with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

537.     Further, during the months leading up to his purchase of a Veranda unit, the

Playground representative (Ms. Bergstrand) represented that his deposit would be "safe in all circumstances" and that he would receive his deposit back should there be any issues with construction.

538.    The security of the deposit was an important factor in Mr. Stockton's decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances and that he would receive his deposit back should there be any issues with construction.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

539.    Relying on Playground's assurance that his deposit would be safe, Mr. Stockton signed the purchase contract in 2003 and made the $68,000 deposit.

540.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Stockton (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

541.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and his deposit was not at risk, Mr. Stockton (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

542.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mr. Stockton's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

543.    In 2008, Mr. Stockton (and the other Plaintiffs) learned that he would not recover any of his $68,000 deposit.

544.     As explained above, Playground's negligent misrepresentations to Mr. Stockton –
and the other Plaintiffs – caused him damages.

545.     Moreover, Playground was unjustly enriched at the expense of the Plaintiffs
because it received a benefit – millions in commissions – that came from money deposited by
Plaintiffs for condominiums that they never received.

## II.     PLAINTIFF RUSSELL THOMPSON

546.     Plaintiff Russell Thompson resides in Canada.  Mr. Thompson is employed by
Cambridge Strategy Asset Management.

547.     During 2004, a Playground representative (Steve Cartner) solicited Mr.
Thompson to purchase a Veranda unit.

548.     Playground marketed Veranda as a real estate investment, more so than a vacation
home.  Playground emphasized the potential capital gain owners would make through the
increase in value of their properties, along with the rental revenue they could receive each year
by renting their luxury property for use when they were not there (which would be most of the
time).

549.     Based on the investment aspect of this transaction, Mr. Thompson was interested
in investing in a unit in Veranda.  Further, he had purchased many other properties from
Intrawest/Playground.

550.     In the few months leading up to Mr. Thompson signing a purchase contract in
2004, the Playground representative (Mr. Cartner) provided Mr. Thompson with the brochure in
which Playground represented that the deposit would "be held in an interest-bearing trust
account, ensuring you are protected from any unforeseen circumstances, right through the
construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the

deposit would be safe in all circumstances, including unforeseen circumstances.

551.    Further, during the months leading up to his purchase of a Veranda unit, the Playground representative (Mr. Cartner) stated that Mr. Thompson's deposit would be safe "in all circumstances."

552.    The security of the deposit was an important factor in Mr. Thompson's decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

553.    Relying on Playground's assurance that his deposit would be safe, Mr. Thompson signed the purchase contract in 2004 and made the deposit of approximately $1 million.

554.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Thompson (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

555.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Mr. Thompson (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

556.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mr. Thompson's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

557.    In 2008, Mr. Thompson (and the other Plaintiffs) learned that he would not recover any of his $1 million deposit.

558.    As explained above, Playground's negligent misrepresentations to Mr. Thompson – and the other Plaintiffs – caused him damages.

559.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

**JJ.    PLAINTIFF HUGH WESTWATER**

560.    Plaintiff Hugh Westwater resides in Columbus, Ohio.  Mr. Westwater is retired.

561.    During 2003, a Playground representative (Steve Cartner) solicited Mr. Westwater to purchase a Veranda unit.

562.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

563.    Based on the investment aspect of this transaction, Mr. Westwater was interested in investing in a unit in Veranda.

564.    Prior to signing the purchase contract, the Playground representative (Mr. Cartner) provided Mr. Westwater with the brochure in which Playground represented that his deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

565.    Further, during the months leading up to his purchase of a Veranda unit, the

Playground representative (Mr. Cartner) represented that Mr. Westwater's deposit would be safe "in all circumstances."

566.    The security of the deposit was an important factor in Mr. Westwater's decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

567.    Relying on Playground's assurance that his deposit would be safe, Mr. Westwater signed the purchase contract in 2003 and made the $96,980 deposit.

568.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Mr. Westwater (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

569.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and his deposit was not at risk, Mr. Westwater (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

570.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mr. Westwater's deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

571.    In 2008, Mr. Westwater (and the other Plaintiffs) learned that he would not recover any of his $96,980 deposit.

572.    As explained above, Playground's negligent misrepresentations to Mr. Westwater – and the other Plaintiffs – caused him damages.

KK.   **PLAINTIFF RICHARD WILDE**

573.    Plaintiff Richard Wilde resides in the United Kingdom.  For the past twenty-five years, he has been self-employed as a financial advisor.

574.    During 2004, a Playground representative (Chad Rowe) solicited Mr. Wilde to purchase a Veranda unit.

575.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

576.    Based on the investment aspect of this transaction, Wilde was interested in investing in a unit in Veranda.

577.    Prior to signing the purchase contract, Mr. Wilde traveled to Turks & Caicos to conduct research on Veranda.  At that time, a Playground representative (Mr. Rowe) provided him with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

578.    Further, during the months leading up to his purchase of a Veranda unit, the Playground representative (Mr. Rowe) represented that Mr. Wilde's deposit would be "safe in all circumstances."

579.    The security of the deposit was an important factor in Mr. Wilde's decision to purchase a Veranda unit.  He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances.  He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

580.    Relying on Playground's assurance that his deposit would be safe, Wilde signed the purchase contract in 2004 and made the $260,000 deposit.

581.    Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Wilde (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

582.    After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Wilde (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

583.    Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Wilde's deposit and the deposits of all other Plaintiffs.  Cherokee ultimately filed for bankruptcy protection in Great Britain.

584.    In 2008, the Wilde (and the other Plaintiffs) learned that he would not recover any of his $260,000 deposit.

585.    As explained above, Playground's negligent misrepresentations to Mr. Wilde – and the other Plaintiffs – caused him damages.

586.    Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

**LL.    PLAINTIFF PETER WILLIAMS**

587.    Plaintiff Peter Williams resides in England.  Mr. Williams is a cosmetic surgeon and general practitioner in medicine.

588.    During 2005, a Playground representative (Chad Rowe) solicited Mr. Williams to purchase a Veranda unit.

589.    Playground marketed Veranda as a real estate investment, more so than a vacation home.  Playground emphasized the potential capital gain owners would make through the increase in value of their properties, along with the rental revenue they could receive each year by renting their luxury property for use when they were not there (which would be most of the time).

590.    Based on the investment aspect of this transaction, Mr. Williams was interested in investing in a unit in Veranda.

591.    Prior to signing the purchase contract, the Playground representative (Mr. Rowe) provided Mr. Williams with the brochure in which Playground represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period."  Playground Brochure at 2, Ex. A.  He read the brochure and noted that the deposit would be safe in all circumstances, including unforeseen circumstances.

592.    Further, during the months leading up to his purchase of a Veranda unit, the Playground representative (Mr. Rowe) represented that his deposit would be "safe in all circumstances" and would not be used for construction.

593.    The security of the deposit was an important factor in Mr. Williams' decision to

purchase a Veranda unit. He would not have purchased a Veranda unit but-for Playground's representations that the deposit would be safe in all circumstances including even unforeseen circumstances and that it would not be used for construction. He would not have purchased a Veranda unit had he known that his deposit would be lost if Cherokee went bankrupt.

594. Relying on Playground's assurance that his deposit would be safe, Mr. Williams signed the purchase contract in 2005 and made the $80,000 deposit.

595. Thereafter, the construction of the Veranda project did not go as smoothly as promised. Nevertheless, Playground repeatedly assured Mr. Williams (and the other Plaintiffs) between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

596. After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposit was not at risk, Mr. Williams (along with the other Plaintiffs) learned in 2008 that his deposit was lost.

597. Between 2004 and 2007, the company in charge of constructing the Veranda resort, Cherokee, exhausted Mr. Williams' deposit and the deposits of all other Plaintiffs. Cherokee ultimately filed for bankruptcy protection in Great Britain.

598. In 2008, Mr. Williams (and the other Plaintiffs) learned that he would not recover any of his $80,000 deposit.

599. As explained above, Playground's negligent misrepresentations to Mr. Williams – and the other Plaintiffs – caused him damages.

600. Moreover, Playground was unjustly enriched at the expense of the Plaintiffs because it received a benefit – millions in commissions – that came from money deposited by Plaintiffs for condominiums that they never received.

## IV.
## ESTOPPEL FROM RELYING ON THE STATUTE OF LIMITATIONS

601.    Playground is estopped from relying on any statute of limitations by virtue of its acts of fraudulent concealment, which include Playground's intentional concealment from, and misrepresentations to, Plaintiffs.  Playground's acts of fraudulent concealment include, without limitation, failing to disclose to Plaintiffs their deposits would not be returned, representing that their deposits were safe from "any unforeseen circumstances," and repeatedly assuring Plaintiffs that the construction project was still moving forward.

602.    Plaintiffs had no knowledge until 2008 that their deposits would not be returned.

## V.
## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE CONNECTICUT
### UNFAIR TRADE PRACTICES ACT ("CUTPA")
### (Conn. Gen. Stat. Ann, § 42-110a, *et seq.*)

603.    Plaintiffs incorporate herein by reference each and every paragraph of this complaint as though set forth in full in this cause of action.

604.    Plaintiff Imtiaz Allie and William Kelly are consumers who reside in Connecticut.

605.    The Connecticut Unfair Trade Practices Act prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a).

606.    CUTPA explicitly provides for a private cause of action for anyone who has suffered an ascertainable loss of money or property as a result of the use or employment of a method, act or practice prohibited by CUTPA.  CONN. GEN. STAT. ANN. § 42-110g.

86

607.   Playground knowingly concealed, suppressed or failed to disclose material facts in connection with its marketing and sale of the property units and solicitations of deposits therefore.

608.   Playground's conduct, as set forth above, constitutes an unfair method of competition and/or unfair and/or deceptive acts and practices prohibited under CUTPA.

609.   As a result of such conduct, Plaintiffs have suffered an ascertainable loss of monies and/or property.

610.   Plaintiffs are entitled to compensatory damages, as well as costs and reasonable attorneys' fees pursuant to Conn. Gen. Stat. Ann. § 42-110g(d).

**COUNT II**
**VIOLATION OF SECTION 349 OF THE**
**NEW YORK GENERAL BUSINESS LAW**

611.   Plaintiffs incorporate the allegations in the preceding paragraphs.

612.   Plaintiffs LaRoccas, Goodmans, and Weihs are consumers who reside in New York.

613.   Playground engaged in unfair and deceptive practices, as described herein, in violation of §349 of the New York General Business Law.

614.   These unfair and deceptive practices have directly and proximately caused damages to Plaintiffs.

**COUNT III**

**VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT and the**
**UNFAIR COMPETITION AND FALSE ADVERTISING STATUTES**

615.   Plaintiffs incorporate the allegations in the preceding paragraphs.

616.   Plaintiffs Rices and Lonky and Patel are consumers who reside in California.

617.    Playground has engaged in unfair and deceptive practices, as described herein, in violation of the California Consumers Legal Remedies Act (Cal. Civ. Code §1750 *et seq*.) and the Unfair Competition and False Advertising Statutes (Cal. Bus. & Prof. Code §§17200, 17500).

618.    These unfair and deceptive practices have directly and proximately caused damages to Plaintiffs.

**COUNT IV**
**VIOLATION OF FLORIDA DECEPTIVE AND**
**UNFAIR TRADE PRACTICES ACT**

619.    Plaintiffs incorporate the allegations in the preceding paragraphs.

620.    Plaintiff Bobby Green is a consumer who resides in Florida.

621.    Playground has engaged in unfair and deceptive practices, as described herein, in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA") §501.201, et seq.

622.    These unfair and deceptive practices have directly and proximately caused damages to Plaintiff Green.

**COUNT V**

**VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE**
**PRACTICES ACT and the UNIFORM DECEPTIVE TRADE PRACTICES ACT**

623.    Plaintiffs incorporate the allegations in the preceding paragraphs.

624.    Plaintiffs Brody and Mishlove and the Kramers are consumers who reside in Illinois.

625.    Playground has engaged in unfair and deceptive practices, as described herein, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. Ann. §505/1 et seq.) and the Uniform Deceptive Trade Practices Act (815 Ill. Comp. Stat. Ann. 510/1 et seq.).

626.    These unfair and deceptive practices have directly and proximately caused damages to Plaintiffs.

## COUNT VI

### VIOLATION OF MASSACHUSETTS CONSUMER PROTECTION ACT

627.    Plaintiffs incorporate the allegations in the preceding paragraphs.

628.    Plaintiffs Dreyers and Bannon are consumers who reside in Massachusetts.

629.    Playground has engaged in unfair and deceptive practices, as described herein, in violation of the Massachusetts Consumer Protection Act (G.L.c. 93A, et seq.).

630.    These unfair and deceptive practices have directly and proximately caused damages to Plaintiffs.

## COUNT VII

### VIOLATION OF OHIO CONSUMER SALE PRACTICES ACT

631.    Plaintiffs incorporate the allegations in the preceding paragraphs.

632.    Plaintiffs Pantelidis and Westwater are consumers who reside in Ohio.

633.    Playground has engaged in unfair and deceptive practices, as described herein, in violation of the Ohio Consumer Sales Practices Act (Ohio Rev. Code Ann. §1345.01 et seq.).

634.    These unfair and deceptive practices have directly and proximately caused damages to Plaintiffs.

## COUNT VIII

### VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES ACT AND CONSUMER PROTECTION LAW

635.    Plaintiffs incorporate the allegations in the preceding paragraphs.

89

636.    Plaintiffs Petrovitchs are consumers who reside in Pennsylvania.

637.    Playground has engaged in unfair and deceptive practices, as described herein, in violation of Pennsylvania's Unfair Trade Practices Act and Consumer Protection Law (Pa. Stat. Ann. Tit. 73 §201-1 et seq.).

638.    These unfair and deceptive practices have directly and proximately caused damages to Plaintiffs.

## COUNT IX

### VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT

639.    Plaintiffs incorporate the allegations in the preceding paragraphs.

640.    Plaintiffs Costellos are consumers who reside in Virginia.

641.    Playground has engaged in unfair and deceptive practices, as described herein, in violation of the Virginia Consumer Protection Act (Va. Code 59.1-196 et seq.).

642.    These unfair and deceptive practices have directly and proximately caused damages to Plaintiffs.

## COUNT X

### VIOLATION OF WEST VIRGINIA CONSUMER CREDIT
### AND PROTECTION ACT

643.    Plaintiffs incorporate the allegations in the preceding paragraphs.

644.    Plaintiff Matheny is a consumer who resides in West Virginia.

645.    Playground has engaged in unfair and deceptive practices, as described herein, in violation of the West Virginia Consumer Credit and Protection Act (W. Va. Code §46A-6-101 et seq.).

646.    These unfair and deceptive practices have directly and proximately caused

damages to Plaintiffs.

## COUNT XI
## NEGLIGENT MISREPRESENTATION

647.   Plaintiffs incorporate by reference those paragraphs set out above as though fully set forth herein.

648.   Before signing the purchase contract and making the deposit, all Plaintiffs received uniform representations made by Playground that their deposits would be safe in all circumstances.

649.   Playground provided most of the Plaintiffs with the same or similar brochure in which it represented that the deposit would "be held in an interest-bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period." Playground Brochure at 2, Ex. A.

650.   After Playground's assurance that their deposits would be safe, all Plaintiffs purchased a Veranda unit and made a deposit equal to twenty percent (20%) of the purchase price.

651.   Thereafter, the construction of the Veranda project did not go as smoothly as promised.  Nevertheless, Playground repeatedly assured Plaintiffs between 2004 and November 2007 that the project was still moving forward and his deposit was safe.

652.   After repeated assurances from Playground between 2004 and 2007 that the project was moving forward and their deposits were not at risk, Plaintiffs learned in 2008 that their deposits were lost.

653.   In 2008, all Plaintiffs learned that they would not recover any of their deposits.

654.   Playground's representation that the deposits would be safe was an incorrect

statement.

655.   Playground negligently made this incorrect statement as it should have determined that the deposits would not be safe in the event that Cherokee (the construction company) went bankrupt.

656.   When deciding whether to purchase units in Veranda, which required making the deposit, Plaintiffs justifiably relied on Playground's incorrect statement that their deposits would be safe.

657.   Plaintiffs suffered damages as a proximate result of this negligent misrepresentation regarding the safety of their deposits.  The security of their deposits was an important factor in Plaintiffs' decision to purchase a Veranda unit.  They would not have purchased a Veranda unit but-for Playground's representations that their deposits would be safe in all circumstances including even unforeseen circumstances.  They would not have purchased a Veranda unit had they known that their deposits would be lost if Cherokee went bankrupt.

## COUNT XII
## UNJUST ENRICHMENT

658.   Except for the Plaintiffs residing in New Jersey, California, Colorado, Florida, Ohio, and Virginia, Plaintiffs incorporate by reference those paragraphs set out above as though fully set forth herein.   This claim is plead in the alternative pursuant to Fed. R. Civ. P. 8.

659.   Playground profited from its marketing of Veranda, as it was compensated for each purchase contract that it persuaded a Plaintiff to execute.

660.   Playground was compensated for each sale it made, receiving millions of dollars in commissions based on the successful marketing efforts it directed at Plaintiffs.

661.   The money that Playground received as commissions came from the deposits at

issue here, *i.e.*, the money that Plaintiffs paid as deposits.

662.   Playground kept the money of Plaintiffs (in the form of commissions) despite the fact that Veranda was never completed and Plaintiffs received nothing in exchange for their deposits.

663.   Therefore, Playground has been unjustly enriched at the expense of Plaintiffs.

664.   Playground received a benefit – millions in commissions – and it would be unjustly enriched if it were permitted to retain that money given that the money came from Plaintiffs as a deposit on condominiums that Plaintiffs never received.

665.   Plaintiffs suffered damages as a proximate result of Playground's unjust enrichment.

## VI.
## DAMAGES

666.   Plaintiffs incorporate by reference those paragraphs set out above as though fully set forth herein.

667.   Plaintiffs would further show that as a result of the acts and/or omissions of Defendant Playground, Plaintiffs have suffered and continue to suffer the following damages for Plaintiffs now sue:

    a.   Out-of-pocket damages for lost deposits that, upon information and belief, total approximately $6.5 million plus interest;

    b.   other out-of-pocket damages, including stamp duty (local tax) paid by Plaintiffs in connection with their Veranda condominiums that total approximately $70,000;

    c.   pre-judgment interest totaling over $1.5 million, and post-judgment interest; and

    d.   costs of court and any other remedy this Court determines is appropriate.

668.   The damages set forth above are sought by Plaintiffs from and against

Playground.

WHEREFORE, Plaintiffs pray for judgment against Defendant Playground for lost deposits, other out-of-pocket losses, lost interest, statutory damages associated with consumer fraud statutes, any other exemplary and/or additional damages to which Plaintiffs may be entitled, costs of court, and such other relief, both at law and in equity, the Court deems proper.

**VII.**
**JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.


Dated:     November 16, 2015


                         Respectfully submitted,

            By:    s/Michael A. Caddell
                   Michael A. Caddell
                   TX State Bar No. 249469
                   **CADDELL & CHAPMAN**
                   1331 Lamar, #1070
                   Houston TX 77010
                   Telephone 713.751.0400
                   Facsimile: 713.751.0906
                   mac@caddellchapman.com

                   COUNSEL FOR PLAINTIFFS

                   OF-COUNSEL

                   Cynthia B. Chapman
                   TX State Bar No. 164471
                   cbc@caddellchapman.com
                   Gregory K. Evans
                   TX State Bar No. 24002065
                   gke@caddellchapman.com
                   Caddell & Chapman
                   1331 Lamar, Suite 1070
                   Houston, TX 77010-3027
                   (713) 751-0400
                   (713) 751-0906 FAX